Good morning, Your Honors. William Braniff on behalf of Matthew Lotze, the appellant in this case. This appeal raises two main issues. The first is, to what extent can the government change its theory of prosecution after a verdict or a conviction or jury verdict or guilty plea in order to include attorney's fees in the law's calculation under the guidelines? The second issue is, can the government get a destruction of justice enhancement under the guidelines simply by having the defendant repeat his fraudulent story to an investigator where that story is not believed and the investigators do not change the course of their investigation based on that statement? Now, as far as the attorney's fees, there are three main cases in this circuit. That is, the George case, the Barani case, and the Cummings case. In each of those cases, the court looked to the indictment as a starting point for the offense conduct. Now, Cummings is the simplest case because that involved parental kidnapping. And by definition, there had to be a court order in place as to the custody of the child. The defendant took their child to another jurisdiction and therefore broke that relationship, if you will, with the court. Of necessity, since the child is moved to another jurisdiction, another court gets involved. And attorney's fees that flow from that are a natural consequence of that conduct. And the court in that case upheld the attorney's fees. And that, in that case, the parent, the wronged parent, attempted to retrieve her children without any success by going to another court. The court found that was appropriate to consider those attorney's fees as a consequence of the crime. In the DeGeorge case, there was a — Here, didn't they settle that attorney's fees issue? They did, Your Honor. $39,000, and then the court considered, what was it, over $100,000 attorney's fees. That's correct, Your Honor. In this case, there was a civil suit. Civil suit. There was a civil suit separate from the criminal prosecution against Mr. Lutzi in which they attempted to recoup the $39,500 they had paid him. There was a consent judgment. He agreed to the $39,500, and each side agreed that they would have absorbed their own attorney's fees. Their own costs, yes.  Right. And then it was later at the sentencing, after Mr. Lutzi pleaded guilty to mail fraud involving false statements to obtain the money, the payment of the money, that the government then added these attorney's fees as a consequence of the criminal conduct. Now, they said, well, it was mentioned in the indictment that he lied to the Chevron by telling them he had destroyed them and was paid. And that's the essential fraud in that case. The attorney's fees, they tried to justify by saying, well, we're going to pay you      We're going to pay you $39,500. Well, Chevron really wasn't interested in the money. They were trying to find out where these toy cars had gone. But that's not a theory that's alleged in the indictment. And the Court has to look to the indictment for the charging conduct. That theory of fraud, that is, Chevron was trying to find these cars, and that's why it spent all these attorney's fees, over $120,000, is not an indictment and should not have been used to calculate Mr. Lutz's sentence, as it was in this case. I'd like to focus for a minute on precisely what fraud this man was convicted of. It was not the fraud in getting the $39,000, was it?  Well, did the government allege that when he made the promise to destroy the goods and by the time he received the money, he had already committed fraud? Yes, Your Honor. He had committed fraud by representing that they were destroyed? By destroying them. When, in fact, there was actually two theories of fraud, Your Honor. One, he represented that he had destroyed them and, therefore, was paid. He turned around and resold them to unknowing third parties without telling them that the cars were defective. But the fraud was not in the formation of the deal with Chevron. At the time, for all we know, when he agreed with Chevron that he would destroy these tools or toys, he intended to do so. For all we know, that's the case. For all we know, Your Honor. I don't think the government... And so all of the fraud that is involved in this case is after he had made the agreement. Yes, Your Honor. And then he made the misrepresentations to Chevron. Is that the fraud that he's convicted of? That is part of the fraud, Your Honor. As I say, there's two theories. And he continued to make the misrepresentations to Chevron. After he had gotten the money, he continued to make those fraudulent representations or false representations throughout the civil litigation, at least for a time during the civil litigation. Did he not? Yes, Your Honor. But we have to analyze it. Okay. Fraud is a false statement in order to obtain something. Yes. It's not simply a false statement. Now, in this case, there was a... There could be a false statement to keep it, too. Your Honor, that's correct, Your Honor. All right. Go ahead. And if that's the theory, that is the cover-up, in order to cover up the fact that he failed to destroy them, that's fine. And in D. George, they had just such a situation where they lied after the fact. And the question was whether or not that was part of the fraud. Your Honor, this was not necessary in order to get further wealth from Chevron. He had already obtained the $39,500. He was protecting that. He was continuing to lie. He sold these cars. Uh-huh. He sold them to unknowing third parties. He didn't tell them that they were, quote, defective. That was the other theory of fraud. But there was no theory of fraud that Chevron had gathered up these cars at great expense and that he had somehow dispersed them to the winds, and they were now harmed, and therefore, they had to file suit in order to find out where these cars were. That's a theory that the government came up with after he pleaded guilty. It's not in the indictment. It's not in the guilty plea. And it should be not be used to calculate his sentence. All right. I just have one question with regard to the obstruction of justice issue. Apparently, you acknowledge that your client lied to the investigators when he was interviewed, created apparently a straw man, Barry or somebody of that. But you say that that's not – that is not enough to justify obstruction of justice. That's correct, Your Honor. And the reason why I say that is because he was repeating the lie of the fraud itself. That is, before the investigators ever got involved, he had this story he told Chevron that he had destroyed them. And when they then came up with these cars that were out there, he said, oh, I found out that a Barry had done this. And there was no Barry, apparently. Yes, there was a Barry. The question is whether he was involved. There was an employee of Chevron, of AMC, which was Mr. Lutz's company, who was named Barry.  And his name came up early on because the people who bought these cars from AMC, without knowing that they were defective, said they bought them from Barry. So Barry was already in the investigation. He was not somebody new. When it came time for the investigators to get involved, they had the benefit of the Chevron investigation. They went to him. He repeats the same story. And as a result of that, they don't get any new information from him. They don't believe him. And they don't change their investigation. They now have to go out and do the investigation they would have had done anyway. And when you ask them, how was it changed, they say, well, we had to do this, we had to do that. They had to do all those things because he had not told them the truth, not because, you know, anything, he diverted them. They already had to do that. He didn't assist them. And that's the obstruction. I will conclude my comments, Ron. Thank you. All right. May it please the Court, Patrick Jaspers with the Department of Justice for the United States. The District Court's factual findings were correct, and the 21-month sentence imposed in this case was proper. Regarding attorney's fees, there are two important points I'd like to make. First, the scheme to defraud of which Mr. Lotz was convicted explicitly included falsely stating to Chevron and Chevron's attorneys that he had not destroyed, that he had destroyed the toy cars. And second, the scheme to defraud of which Mr. Lotz was convicted explicitly ran from and thereby encompassed the time period in which Chevron incurred the attorney's fees that are now being challenged. Mr. Lotz should not be allowed now to redefine the crime to which he pled guilty. The fraud to which he pled guilty included not only failing to destroy the toy cars and reselling them, the fraud to which he pled guilty also included lying to Chevron's attorneys about what happened. Well, when he pled guilty, did he admit all these facts? No, Your Honor. At the Rule 11 hearing, the proffer that he made referred to the non-destruction. But the purpose of a proffer at a Rule 11 hearing is to establish the elements of the offense and is to establish to the court that the defendant was guilty. The proffer is not an expansive, exhaustive catalog of every wrong deed that the defendant did. Well, sometimes it does. Sometimes it doesn't. That may be true, Your Honor, but in this case, the fact that he did not... Was there a written plea agreement? There was no plea agreement in this case, Your Honor. The defendant walked in and pled guilty to these counts. Pled guilty, all right. And the fact that you did not... The government, were you there at the time? I was not present when the defendant entered the guilty plea. Well, but the assistant U.S. attorney could have had all this stuff in there. Yes, Your Honor, the government was... In addition to that, now this happened and, you know, you're all in that way. Yes, Your Honor, but I don't believe that somehow what a defendant proffers to at a Rule 11 hearing somehow shrinks back the crime he's pleading guilty to in the indictment. And the defendant can't, at the district court, come in and say, yes, I plead guilty. Well, did the indictment specifically cover this subject that you're bringing, talking about now? Your Honor, the phrasing in the indictment, falsely stating to Chevron's attorneys, is referring to his lies in the civil litigation, and the time period that expressly ran through May 2003 is referring to the private litigation. The non-destruction of the toy cars, the submission of the fake evidence to Chevron, that's all in 2001. What about when they settled out with Chevron? Each side agreed to bear its own costs and attorney's fees. Your Honor, I think that's irrelevant to the district court's finding as to whether Chevron's attorney's fees were a direct result of the crime charged. The crime to which Mr. Lotz pled guilty included lying to Chevron's attorneys, and the district court made a factual finding that Chevron's attorney's fees were a direct result of the crime of conviction. Was that amount added into the restitution, the full amount of the attorney's fees? Yes, Your Honor. How can you do that if both sides agreed to pay their own attorney's fees? Your Honor, I don't think what civil litigants decide handcuffs the criminal court in assessing what the appropriate penalty for this offense should be. As the record shows, the purpose of this lawsuit — Well, what's the purpose of restitution as to — The purpose of rest — See that Chevron is whole, right, made whole? Yes, Your Honor, and I may have misspoke. Chevron already agreed that they didn't — they're going to pay their own attorney's fees. But what difference — Well, Your Honor, Chevron decided to stop the civil litigation. Chevron went into the civil litigation to try to find out what had happened to these toy cars and to try to get a hold of them before they injured someone. But anyway, it isn't going to make much difference anyway, is it? The district — and just to answer Your Honor, your earlier question, the district court did say that if Mr. Lotz ever paid the $39,500 settlement in the private litigation, that that would be subtracted from the restitution amount in the criminal case. Just to dwell on that for a second, I presume that in the civil litigation, Chevron's theory of tort recovery was fraud. Am I right? I believe it was fraud and also breach of contract. And do you know whether or not either of those claims carried a fee-shifting arrangement? I don't know, Your Honor. All right. It's very — I mean, Chevron was — Your position is it doesn't matter. It doesn't matter. I understand that. But I was just curious as to whether or not when Chevron settled its case, it gave up on a fee-shifting arrangement or not, as it lends strengths or weakness to the fact of the settlement in this context. Go ahead. That's correct, Your Honor. And whether the civil settlement handcuffs — should have handcuffed the district court in this Federal case, that was not briefed on appeal. It was actually briefed in the district court. Well, other than handcuffs, you know, I don't know. But that issue hasn't been briefed. How about stymied? Stymied. Stymied, Your Honor. That issue really hasn't been briefed, though, the impact of the civil settlement. The defendant has not raised that issue in the Ninth Circuit. That issue was raised in the district court, and it was briefed in the district court. And there's no Ninth Circuit precedent. Not before us here. But it's not before us here, is it? It's not before you now. And the fact that Chevron decided at the 39 — decided that it was never going to get the truth out of Mr. Lotz through civil discovery and that it was never going to recover, the fact that it decided to cut its losses and settle for a $39,500 symbolic settlement that has not been paid seems irrelevant to assessing the loss that should give rise to the sentence. When Chevron made the deal with Mr. Lotz, was that in writing? The original contract to destroy the toy cars? Yes, Your Honor. That's in the record. Would that say anything about attorneys' fees? No, the contract is silent. As far as I know, no one was contemplating that he wasn't going to do what he was supposed to do. Turning to the second issue regarding obstruction, when investigators interviewed Mr. Lotz in February 2002 to try to find out where these dangerous toy cars were, Mr. Lotz did not remain silent. He did not merely deny guilt. He did not simply fail to assist the investigation. He spoke to the investigators for several hours. He signed a two-page affidavit that was filled with lies that were designed to and did obstruct the investigation. The investigator testified at the sentencing hearing. The defendant had the opportunity to cross-examine him, and the district court found that the investigation was obstructed, made a factual finding that the investigation was obstructed by what Mr. Lotz said. It slowed down the investigation, and it diverted the investigation to this ex-employee, Barry, who it turns out had nothing to do with the resale of the toy cars, but on whom Mr. Lotz was trying to cast suspicion. Yeah, he's a bad guy, no doubt about that. You wonder why Chevron wouldn't trust him. Have you ever done business with him before? This is not on the record, Your Honor, but I asked the same question, and Chevron said we hadn't dealt with the situation. He came recommended by another business that we had dealt with, and he was the lowest bidder. They're really, I'm surprised they just, a company like that, that just didn't go and put the trucks on the road and the little toys on the road and just drive over them or give somebody a sledgehammer. The second time around they monitored the disruption. When they got the cars back the next time, they learned their lesson. Well, the temptation is always there. I mean, my customs, they see that the stuff's destroyed right there and then. So you think before they put those toys out that they'd have someone check them out for danger to children, because that's always a big concern. All right. Thank you, Your Honor. I'll still keep my Chevron credit card. Okay. Thank you, Your Honor. We're all done. Thanks.
judges: Pregerson, Leavy, Beistline